# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GLENDALE HOGGARD<br>   3109 Nash Place, S.E.<br>   Washington, D.C. 20020<br><br>       -and-<br><br>LINDA PATTON<br>   2244 Coventry Drive<br>   Winter Park, FL 32792<br><br>On behalf of themselves and all others<br>similarly situated,<br><br>          Plaintiffs, | Civil Action No. 1:17-cv-00099-TK |
|       v. | |
| NATIONSTAR MORTGAGE LLC OF<br>DELAWARE, D/B/A CHAMPION<br>MORTGAGE COMPANY,<br>350 Highland Drive<br>Lewisville, Texas 75067<br><br>        Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Glendale Hoggard and Linda Patton, on behalf of themselves and all others similarly situated, hereby submit this complaint against Defendant Nationstar Mortgage dba Champion Mortgage ("Champion") and allege as follows:

### NATURE OF THIS ACTION

1.      Plaintiffs are senior citizens who took out reverse-mortgage loans secured by their home to access the equity they had built up in their respective homes.  Defendant Champion was the servicer of both Mr. Hoggard's and Ms. Patton's reverse mortgage.  One of the conditions of a reverse mortgage is that the borrower reside in the property securing the reverse mortgage.

2.      After servicing Plaintiffs' reverse mortgages for a period of time, Champion

eventually declared both Mr. Hoggard and Ms. Patton in default on their loans for purportedly failing to return a form called an Annual Occupancy Certificate to Champion. Champion uses the Annual Occupancy Certificate to determine whether a borrower is actually residing in the property securing the reverse mortgage. Thereafter, Champion started assessing $20 occupancy inspection fees to the balance of Plaintiffs' loans every month. The fee was purportedly for inspections of Plaintiffs' homes to determine whether they were occupying their homes. Champion continued assessing the inspection fee each month regardless of the outcome of each inspection.

3.    Plaintiffs' loan agreements with Champion did not require them to submit an Annual Occupancy Certificate to be in good standing on their loans. Accordingly, Champion violated the terms of the loan agreement by declaring that they were in default. Furthermore, the loan agreement required Champion to give Plaintiffs notice before conducting any inspection of their homes. Champion did not attempt to contact Plaintiffs or otherwise give them notice before each inspection. Instead, Champion unilaterally and without proper notice assessed the monthly fee to the balance of their loans after an inspection had purportedly occurred.

4.    In addition, to the extent Champion did actually conduct inspections of Plaintiffs' properties, they were done on a drive-by basis, which, according to industry standards, is not a reasonable method of conducting an occupancy inspection. A drive-by inspection is when an occupancy inspector merely "drives by" a borrower's residence in his or her vehicle to look at the outside of the home to see whether it appears inhabited. The inspector does not get out of the vehicle to take a closer look at the premises or knock on the door to determine whether the borrower's property is inhabited.

5.    Champion's practice of declaring reverse mortgage loans in default for failure to return an Annual Occupancy Certificate and then charging borrowers a monthly fee for a drive-

by occupancy inspection without giving borrowers notice of each inspection is an unreasonable and unlawful practice that violates the terms of Champion's agreement with borrowers, as well as the laws of the District of Columbia and Florida. Champion's conduct also ran afoul of federal guidance relating to servicing of reverse mortgages.

6.    Furthermore, Champion derives substantial revenue from this practice to borrowers' detriment. It is well known within the reverse-mortgage industry that many borrowers do not return the Annual Occupancy Certificate for a variety of reasons. Indeed, industry sources have reported that as many as twenty percent (20%) of reverse mortgage borrowers do not return the Annual Occupancy Certificate.

7.    Champion profits by declaring these borrowers in default and charging inspection fees because Champion earns interest on the full outstanding loan amount, including all fees. By artificially inflating loan balances with unnecessary fees, Champion earns interest on bloated balances. Once a borrower's house is sold, Champion is reimbursed the full amount of fees assessed on the borrower.

8.    Conversely, borrowers are harmed by this practice because the fees reduce the equity in their homes. The reduction can be substantial because the amount of fees are compounded by interest over time. As a result, once the borrower's house is sold, the borrower or the borrower's heirs receive less money from the sale.

9.    Champion's practice also harms borrowers because by improperly declaring their loans in default, Champion can accelerate the full value of the loan and declare it due and payable. As a consequence of declaring the loan due and payable, Champion may begin foreclosure proceedings and charge borrowers even more fees to their detriment, such as appraisal fees and attorneys' fees and costs associated with the foreclosure referral—further decreasing borrowers' equity in their homes.

10.     Plaintiffs bring this class action to recover damages, restitution, and other relief available in law or in equity on behalf of themselves and other senior homeowners that have been victimized by Champion's unreasonable and unlawful practices in connection with the assessment of occupancy inspection fees to the balance of reverse mortgage loans.

## THE PARTIES AND JURISDICTION

11.     Glendale Hoggard is a resident of the District of Columbia.

12.     Linda Patton is a resident of Seminole County, Florida.

13.     Defendant Champion is a Delaware corporation with its principal office located at 350 Highland Drive, Lewisville, Denton County, Texas 75067.  Champion does business throughout the United States, including Florida.

14.     This Court has jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). Plaintiffs and members of the classes have suffered aggregate damages exceeding $5,000,000, exclusive of interest and costs, and members of the class of plaintiffs are citizens of a state different from any defendant.

15.     Venue is appropriate in this district according to 28 U.S.C. § 1391(b)(2) and (b)(3).

16.     This Court has personal jurisdiction over Defendant. Champion conducts substantial business in the District of Columbia and has extensive, systematic and continuous contact within the District of Columbia. Additionally, a substantial part of the actions which gave rise to Mr. Hoggard's causes of action occurred in this jurisdiction.

## FACTS COMMON TO ALL CLAIMS

### I.     The HECM reverse mortgage program.

17.     Reverse mortgages are a special kind of home loan that allows senior citizens to convert home equity into cash without having to move out or make periodic mortgage payments.

Unlike a traditional forward mortgage—where the lender loans the principal at origination and the borrower pays off the balance of the loan over time—a reverse mortgage lender advances funds to the borrower at origination and no periodic payments are due from the borrower. Instead, the balance of the reverse mortgage increases over time due to accruing interest and fees and it becomes due and payable when the borrower dies, sells the home, or permanently relocates from the home.

18.     There are two main types of reverse mortgages:  home equity conversion mortgages (HECM) and proprietary reverse mortgages.  HECM loans are insured by the U.S. Federal Housing Administration (FHA) and constitute the vast majority of reverse mortgages. Congress authorized the HECM loan program in 1987.  The purpose of the program was to provide older homeowners with a means to access their home equity to reduce the economic hardship resulting from increased healthcare costs and living expenses at a time in their lives when their income is reduced.  FHA insurance provides an incentive for lenders to make HECM loans because the lenders are guaranteed that they will be repaid in full at the time the loan becomes due and payable, even if the loan balance exceeds the value of the home.

19.     The FHA and the U.S. Department of Housing and Urban Development (HUD) issued regulations governing the eligibility requirements for HECM loans.  HECM borrowers must be at least sixty-two (62) years of age and the property serving as the collateral for the loan must be titled in the borrowers' names and must be the borrowers' principal residence.  In addition, borrowers are required to obtain counseling from an independent third party not associated with the loan transaction before taking out the loan.

20.     The terms of HECM loans are governed by a uniform promissory note (the "Note"), deed of trust (the "Security Instrument"), and loan agreement (the "Agreement") approved by HUD.

21.     The Note states that the lender may require immediate payment of the loan in full if the property securing the loan ceases to be the principal residence of the borrower.

22.     The Security Instrument states that the "Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument and Borrower . . . shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument."

23.     The Security Instrument states that "Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property."

24.     The Security Instrument states that the lender "may collect fees and charges authorized by the Secretary" of HUD.

25.     The Security Instrument also states that the borrower is required to pay all property taxes and maintain and pay for property insurance.

26.     The Agreement allows the lender to make advances to the balance of the loan to cover property charges such as taxes and property insurance premiums in the event such charges are not paid by the borrower.  The Agreement also allows the lender to make advances to the loan to cover reasonable expenditures to protect and preserve the property.

**II.     Champion's unlawful conduct in connection with servicing HECM loans.**

27.     Mortgage servicers are responsible for the administrative tasks associated with the day-to-day management of a mortgage loan.  They are responsible for collecting payments from borrowers, holding funds in escrow accounts for insurance and tax purposes, remitting such escrow funds, interacting with borrowers, and administering the mortgage foreclosure process. They are also responsible for maintaining and managing the balance of a mortgage loan.  This

6

includes not only ensuring that payments are properly applied to the balance of the loan, but servicers are also authorized by the lender to assess fees and other charges to the balance of a loan.

28.     Because HECM loan borrowers do not make monthly principal and interest payments, the servicer's role is primarily to ensure that the property taxes are paid, property insurance maintained, and the borrower is not in default.  In addition, HECM loan servicers are authorized to make advances to the balance of the loan to cover reasonable property charges and fees.

29.     Champion is one of the country's leading HECM loan servicers.  As of December 31, 2015, Champion serviced approximately $29.9 billion in reverse-mortgage debt.

30.     The HECM loans serviced by Champion are governed by the uniform Note, Security Instrument, and Agreement described above.

31.     As explained, the terms of the Note and Security Instrument require borrowers to maintain the property securing the HECM loan as their primary residence.  To determine whether a borrower is in fact living in the property, on an annual basis Champion sends borrows an "Annual Occupancy Certificate" form.  The certificate states that Champion is required to confirm on an annual basis that the property securing the loan is the borrower's primary residence.  The form then asks borrowers to sign and certify under penalty of perjury that the property is their primary residence.

32.     If Champion purportedly does not have a record of receiving a signed copy of the Annual Occupancy Certificate from a borrower, then Champion will send the borrower a "2nd Notice," which contains another copy of the Annual Occupancy Certificate.  The 2nd Notice states that "This Annual Certification is a requirement of your reverse mortgage."  It further states that: "If you do not complete and return this document by mail or fax, you may be in

default of your reverse mortgage.  If we do not receive a response within 30 days, we will be required to send a representative to your home to confirm your occupancy status.  Pursuant to the terms of your agreement, the cost of this visit will be charged to your loan balance."

33.    If Champion does not have a record of receiving a signed copy of either the Annual Occupancy Certificate or the 2nd Notice from a borrower, then Champion deems the loan to be in default.  However, neither the Note, Security Instrument, nor the Agreement state that a borrower is in default for failure to execute an Annual Occupancy Certificate.  Nor is there any term within these loan documents requiring a borrower to execute an Annual Occupancy Certificate.

34.    Champion sends an inspector to the borrower's house to conduct an occupancy inspection ostensibly to determine whether the borrower is occupying the property.  These occupancy inspections are typically drive-by inspections by which the inspector merely drives by the property in his or her vehicle to observe whether the property appears occupied.

35.    Champion then assesses a fee to the balance of the borrower's loan as payment for the occupancy inspection.  This fee is typically $20, which is the maximum HUD allows a HECM loan servicer to charge for an occupancy inspection.

36.    Champion continues conducting these occupancy inspections on at least a monthly basis and continues assessing fees for the inspection to the balance of a borrower's loan, *regardless of the outcome of the inspection*.

37.    Champion's practice of declaring HECM loan borrowers in default for failure to submit an Annual Occupancy Certificate and charging borrowers for drive-by occupancy inspections on a monthly basis regardless of the outcome of the inspection is unreasonable and unlawful.

38.     The HECM loan documents do not require borrowers to submit an Annual

Occupancy Certificate to remain in good standing on their loan.  Nor does Champion provide

borrowers with notice of each monthly inspection or an explanation of the purpose of each

inspection before conducting them as required by the Security Instrument.  Indeed, according to

HUD guidance, loan servicers are required to verify whether a borrower is occupying the

property securing the loan by other means, such as calling the borrower, before sending an

occupancy inspector.  MORTGAGEE LETTER 2008-31, Attachment 2:  Inspection Service

Requirements and Cost Schedule ("When a mortgage is in default . . . and efforts to reach the

Mortgagor by telephone or correspondence . . . have proven unsuccessful, the Mortgagee must

make an Occupancy Inspection in accordance with the guidelines herein to determine if the

property is vacant or abandoned[.]").

39.     Furthermore, there is no reason for Champion to conduct occupancy inspections

on a monthly basis.  Champion deemed one Annual Occupancy Certificate sufficient proof of

occupancy.  One occupancy inspection should be enough.

40.     At a minimum, Champion should not have continued conducting occupancy

inspections on a monthly basis without first attempting to contact borrowers to determine their

occupancy status before each inspection.  Indeed, HUD guidance has stated that servicers should

attempt to contact borrowers by phone or correspondence before conducting additional

occupancy inspections and that a default due to non-occupancy should not be allowed to

continue indefinitely.  HUD Directive Number: 4330.1, Administration of Insured Home

Mortgages, § 9-9(b)(7) ("During the duration of any continuing delinquency, mortgagees must

continue to prudently service the mortgage including regular attempts to contact the delinquent

mortgagor by telephone and by written correspondence.  No delinquency should be allowed to

continue indefinitely without some type of contact with the mortgagor.").

41.     And a drive-by inspection is not a reasonable way to conduct an occupancy inspection. HUD guidance has stated that a drive-by inspection alone is not sufficient evidence of occupancy or vacancy. MORTGAGEE LETTER 2008-31, Attachment 2: Inspection Service Requirements and Cost Schedule ("A drive-by inspection alone is not acceptable evidence of occupancy or vacancy.").

42.     Champion derives substantial revenue from these occupancy inspections. It is well known within the reverse-mortgage industry that a significant number of borrowers do not return the Annual Occupancy Certificate. Many borrowers perceive the request as offensive and do not understand the purpose of submitting it since they are clearly occupying their homes. And they certainly do not appreciate the negative consequences that will befall them if they fail to return this document. Indeed, industry sources have reported that over 20% of borrowers do not return the Annual Occupancy Certificate.

43.     Champion capitalizes off this alleged deficiency. When the loan is repaid either through foreclosure or by the FHA, Champion is paid for all advances it made to the loan, including advances for occupancy inspection fees, plus interest. Champion earns interest on artificially inflated loan balances padded with unnecessary inspections and fees.

44.     Borrowers are harmed by Champion's unreasonable and unlawful occupancy inspections because the inspection fees reduce the equity they have in their homes. Indeed, over time the charges for the occupancy inspection fees can significantly decrease the equity borrowers have in their homes because they are added into the full balance of their loan which is compounded by interest. Accordingly, when their homes are sold, the borrower or the borrower's heirs receive less money from the sale.

45.     Borrowers are also harmed because as a result of declaring their loans in default for failure to return the Annual Occupancy Inspection form, Champion can accelerate the full

value of the debt and declare the loan due and payable immediately.  Champion may then begin foreclosure proceedings and assess additional fees to the balance of a borrower's loan such as appraisal fees for attorneys' fees and costs.

## NAMED PLAINTIFFS' FACTS

**GLENDALE HOGGARD**

46.    Plaintiff Glendale Hoggard resides at 3109 Nash Place, S.E., Washington, DC 20020 (the "Property").  The Property is currently Mr. Hoggard's primary residence and has been his primary residence at all times relevant to this lawsuit.

47.    On or about January 8, 2010, Mr. Hoggard executed copies of the uniform Note, Security Instrument, and Agreement for a HECM loan not to exceed the principal amount of $495,000 with an interest rate of 5.560% per year.  The lender of his HECM loan was Bank of America, N.A.  The total amount advanced by Bank of America at closing was $212,486.  Approximately $147,000 of the loan proceeds went towards paying off a previous loan on the Property.  Another approximately $11,500 consisted of settlement costs paid to Bank of America.  Mr. Hoggard received approximately $54,000 in proceeds from the loan.

48.    On or about September 25, 2012, Bank of America assigned the Security Instrument and Note to Champion.  Accordingly, Champion assumed all rights and obligations of the Security Instrument and Note.

49.    On or about January 1, 2014, Champion sent Mr. Hoggard an Annual Occupancy Certificate identical to the Annual Occupancy Certificate form described above.

50.    On or about February 3, 2014, Champion sent Mr. Hoggard a 2nd Notice identical to the 2nd Notice form described above.

51.    On or about March 21, 2014, Champion sent Mr. Hoggard another Annual Occupancy Certificate form.

52.     On or about March 27, 2014, Champion sent Mr. Hoggard another 2nd Notice form.

53.     On or about April 2, 2014, Champion sent Mr. Hoggard a monthly reverse mortgage statement stating that his loan was in default and that the reason for the default was "Unreturned Occupancy Certificate."

54.     On or about April 14, 2014, Champion started assessing Mr. Hoggard a monthly occupancy inspection fee in the amount of $20. Champion continued assessing Mr. Hoggard a $20 monthly occupancy inspection fee every month thereafter until March 23, 2015. Mr. Hoggard's monthly reverse mortgage statement continued to state that the reason Mr. Hoggard was in default was due to "non-occupancy."

55.     Furthermore, there was no need for multiple inspections because Mr. Hoggard was openly and obviously occupying the Property. It would be apparent from even a cursory inspection that Mr. Hoggard's property was occupied. In fact, on several occasions Mr. Hoggard was on his front porch when a drive-by inspector drove by his home to conduct an occupancy inspection. According to HUD guidance, a servicer should not assess fees for occupancy inspections to a borrowers' account where there is evidence that the property is occupied. HUD Directive Number: 4330.1, Administration of Insured Home Mortgages, § 9-9(a)(2)(d) ("If there is evidence that the mortgagee knew the mortgagor was still in occupancy . . . [occupancy inspection] charges are inappropriate and must not be charged to the mortgagor. . . .").

56.     Champion's unreasonable and unlawful inspections were conducted for the sole purpose of assessing fees to the balance of Mr. Hoggard's HECM loan and not for determining occupancy.

57.     From April 2014 to March 2015, Mr. Hoggard was assessed $220 in occupancy inspection fees.

58.    Furthermore, on or about June 12, 2014, Champion sent Mr. Hoggard a "Mortgage Due & Payable Notification" declaring that his mortgage was in default due to "non-occupancy of the property" and that the full value of his loan needed to be paid in full immediately.  Champion also assessed Mr. Hoggard a property appraisal fee in the amount of $335.00.

59.    On or about March 6, 2015, after assessing Mr. Hoggard an inspection fee every month for the past year, Champion sent Mr. Hoggard a letter notifying him that the June 12, 2014 due and payable notification had been "rescinded" because the "Non-Occupancy has been cured."  The letter did not state how the purported "non-occupancy" was cured.

60.    That same month Champion assessed Mr. Hoggard $732.46 in attorneys' fees and costs to the balance of his loan, presumably for foreclosure-related proceedings related to his supposed default for non-occupancy.

61.    Mr. Hoggard was damaged as a result of Champion's unreasonable and unlawful practice of declaring his loan in default for failure to return the Annual Occupancy Certificate and conducting occupancy inspections on a monthly basis thereafter.  The fees for inspections and other default-related fees such as the appraisal fee and attorneys' fees and costs decreased the equity he had in his Property.  At the time of the filing of this Class Action Complaint, Mr. Hoggard's Property was worth substantially more than the outstanding balance of his loan.

**LINDA PATTON**

62.    Plaintiff Linda Patton resides at 2244 Coventry Drive, Winter Park, Florida 32792 (the "Property").  The Property is currently Ms. Patton's primary residence and has been Ms. Patton's primary residence at all times relevant to this lawsuit.

63.    On or about July 21, 2010, Ms. Patton entered into a HECM loan not to exceed the principal amount of $247,500 with an interest rate of 5.490% per year.  The lender of the

HECM loan was Bank of America, N.A. The total amount advanced by Bank of America at closing was $92,730. Approximately $7,000 consisted of settlement costs paid to Bank of America.  Ms. Patton received approximately $86,000 in proceeds from the loan. She used the proceeds from the loan primarily for daily living expenses and to make some renovations and improvements to her home.

64.     On or about September 19, 2012, Bank of America assigned the Security Instrument and Note to Champion.  Accordingly, Champion assumed all rights and obligations of the Security Instrument and Note.

65.     Sometime in 2013, Champion allegedly sent Ms. Patton an Annual Occupancy Certificate identical to the Annual Occupancy Certificate form described above. Ms. Patton does not recall receiving the 2013 Annual Occupancy Certificate, though she does remember receiving and returning Annual Occupancy Certificates from years prior to 2013.

66.     On or about October 3, 2013 Champion sent Ms. Patton a monthly reverse mortgage statement stating that her loan was in default and that the reason for the default was "Unreturned Occupancy Certificate." Prior to the October 3, 2013 statement, Ms. Patton does not recall receiving any telephone calls or communications from Champion warning her that she may be placed in default for failure to return the Annual Occupancy Certificate.

67.     Thereafter, in February 2014, Champion started assessing Ms. Patton a monthly occupancy inspection fee in the amount of $20.

68.     Champion continued assessing Ms. Patton a $20 monthly occupancy inspection every month until approximately March, 2015.  Ms. Patton's monthly reverse mortgage statement continued to state that the reason Ms. Patton was in default was due to "non-occupancy."

69.     There was no need for multiple inspections because Ms. Patton was openly and obviously occupying the Property.  It would be apparent from even a cursory inspection that Ms. Patton's property was occupied. The lawn on her Property was regularly mowed, and she often left the garage door open while she was home. According to HUD guidance, a servicer should not assess fees for occupancy inspections to a borrowers' account where there is evidence that the property is occupied.  HUD Directive Number: 4330.1, Administration of Insured Home Mortgages, § 9-9(a)(2)(d) ("If there is evidence that the mortgagee knew the mortgagor was still in occupancy . . . [occupancy inspection] charges are inappropriate and must not be charged to the mortgagor. . . .").

70.     Champion's unreasonable and unlawful inspections were conducted for the sole purpose of assessing fees to the balance of Ms. Patton's HECM loan and not for determining occupancy. Champion ignored the results of its occupancy inspections and continued to order them every month, even if the inspection determined the Property was occupied.

71.     From February 2014 to March 2015, Ms. Patton was assessed $280 in occupancy inspection fees.

72.     Furthermore, on or about January 21, 2014, Champion sent Ms. Patton a "Mortgage Due & Payable Notification" declaring that their mortgage was in default due to "non-occupancy of the property" and that the full value of their loan needed to be paid in full immediately.

73.     On May 2, 2014, Champion filed a foreclosure action against Ms. Patton in Seminole County. The Complaint stated "The Loan is in default due to non-occupancy of the Property as the principal residence of the Borrower since 1/10/2014." The Complaint stated no other reason for the default aside from "non-occupancy." The Complaint asked for the full unpaid principal balance to be repaid immediately. Ms. Patton does not recall receiving any

telephone calls from Champion to verify her occupancy prior to Champion initiating the foreclosure action against her.

74.     Ms. Patton, with the assistance of a legal aid organization, filed a Motion to Dismiss on September 2, 2014. She attached to the Motion to Dismiss a signed Annual Occupancy Certificate, which was sent to her on August 18, 2014. She also attached utility bills demonstrating occupancy. As a result, Champion filed a Notice of Rescission of Default on September 10, 2014. On the same day, Champion sent Ms. Patton a letter stating notifying her that the January 2014 due and payable notification had been "rescinded" because the "Non-Occupancy has been cured."

75.     In 2014, Champion assessed Ms. Patton $2,778 in attorneys' fees and costs to the balance of their loan, presumably for foreclosure-related proceedings related to her supposed default for non-occupancy.

76.     Champion also assessed Ms. Patton three property appraisal fees in the amount of $335.00 each.

77.     Ms. Patton was damaged as a result of Champion's unreasonable and unlawful practice of declaring her loan in default for failure to return the Annual Occupancy Certificate and conducting occupancy inspections on a monthly basis thereafter.  The fees for inspections and other default-related fees such as the appraisal fees and attorneys' fees and costs decreased the equity she had in her Property.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action under Rule 23.

79.     The classes Plaintiffs seeks to represent (collectively, the "Classes") are defined as follows:

All residents of the United States of America who had a HECM loan serviced by Champion Mortgage and whose loans were declared in default for failure to return an Annual Occupancy Certification form and whose accounts were assessed occupancy inspection fees on a monthly basis.

All residents of the District of Columbia who had a HECM loan serviced by Champion Mortgage and whose loans were declared in default for failure to return an Annual Occupancy Certification form and whose accounts were assessed occupancy inspection fees on a monthly basis.

All residents of the state of Florida who had a HECM loan serviced by Champion Mortgage and whose loans were declared in default for failure to return an Annual Occupancy Certification form and whose accounts were assessed occupancy inspection fees on a monthly basis.

80.     Excluded from the Classes are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Classes are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

81.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded or otherwise modified.

82.     Plaintiffs reserve the right to establish sub-classes as appropriate.

83.     This action is brought and properly may be maintained as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Classes.

84.     Numerosity:  On information and belief, thousands of HECM mortgagors nationwide and at least hundreds of HECM mortgagors in the District of Columbia and Florida have been charged unreasonable and unlawful occupancy inspection fees by Defendant. The proposed Classes are each so numerous that individual joinder of all members is impracticable.

85.     Common Questions of Law and Fact Predominate:  There are many questions of law and fact common to Plaintiffs and the class members, and those questions substantially

predominate over any questions that may affect individual class members.  Common questions of fact and law include:

a)  Whether Defendant declares HECM loan borrowers in default for failure to return and Annual Occupancy Certificate;

b)  Whether Defendant assesses occupancy inspection fees on HECM loan borrowers for failure to return an Annual Occupancy Certificate;

c)  Whether Defendant assesses occupancy inspection fees on a monthly basis on HECM loan borrowers for failure to return an Annual Occupancy Certificate;

d)  Whether Defendant conducts drive-by occupancy inspections;

e)  Whether Defendant failed to provide Plaintiffs and the class members notice of each occupancy inspection prior to conducting the inspection and assessing an inspection fee;

f)  Whether Defendant conducts additional occupancy inspections regardless of the outcome of any prior occupancy inspections, and assesses fees for such inspections;

g)  Whether Defendant initiates default and/or foreclosure proceedings regardless of the outcome of previous occupancy inspections;

h)  Whether Defendant continues to assess foreclosure-related fees regardless of the outcome of occupancy inspections;

i)  Whether Defendant breached its contract with Plaintiffs and the class members by declaring their loans in default and assessing occupancy inspection fees and foreclosure-related fees as alleged herein;

j)  Whether Defendant breached the covenant of good faith and fair dealing with Plaintiffs and the class members by declaring their loans in default and assessing

occupancy inspection fees and foreclosure-related fees as alleged herein;

k) Whether Defendant's conduct violated the D.C. Mortgage Lender and Broker Act;

l) Whether Defendant's conduct violated Florida Mortgage Lending Law;

m) Whether Defendant's conduct violated the D.C. Consumer Protection Procedures Act;

n) Whether Defendant's conduct violated the Florida Deceptive and Unfair Trade Practices Act;

o) Whether Defendant was unjustly enriched by declaring Plaintiffs and class members' loans in default and assessing occupancy inspection fees and foreclosure-related fees as alleged herein;

p) Whether Plaintiffs and the class members have been damaged as a result of Defendant declaring their loans in default and assessing occupancy inspection fees and foreclosure-related fees as alleged herein; and

q) Whether Plaintiffs and the class members are entitled to injunctive and/or declaratory relief as a result of Defendant declaring their loans in default and assessing occupancy inspection fees and foreclosure-related fees as alleged herein.

86.    Typicality:  Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and all members of the Classes have been similarly affected by Defendant's actions.

87.    Adequacy of Representation:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation.  Plaintiffs and counsel are committed to

vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so.

88.    Superiority of Class Action:  Plaintiffs and the members of the Classes suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Classes is impractical.  The amounts at issue would not be economical to litigate individually. Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies caused by Defendant's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

## <u>COUNT 1:  BREACH OF CONTRACT</u>

89.    Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

90.    Plaintiffs and the class members had a contract with Champion.  The Note, Security Instrument, and Agreement constitute the terms of that contract.

91.    Defendant breached the terms of its contract with Plaintiffs and the class members by declaring Plaintiffs and class members in default for failure to return the Annual Occupancy Certificate form and assessing occupancy inspection fees and foreclosure-related fees on Plaintiffs and class members for failure to return the Annual Occupancy Certificate.

92.     Defendant breached the terms of its contract with Plaintiffs and the class members by: failing to provide Plaintiffs and class members notice of each occupancy inspection before conducting each inspection; assessing occupancy inspection fees on a monthly basis regardless of the outcome of any prior inspection; and assessing foreclosure-related fees for purported non-occupancy regardless of the outcome of the occupancy inspection(s).

93.     Plaintiffs and class members have been damaged as a result of Defendant's breach.

## COUNT TWO:  BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

94.     Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

95.     Plaintiffs and the class members had a contract with Champion.  The Note, Security Instrument, and Agreement constitute the terms of that contract.

96.     All contracts contain an implied covenant of good faith and fair dealing which prevents either party from doing anything that has the effect of injuring the right of the other party to receive the fruits of the contract.

97.     If a party to the contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the covenant of good faith and fair dealing.

98.     Defendant breached the implied covenant of good faith and fair dealing with Plaintiffs and the class members by declaring Plaintiffs and class members in default for failure to return the Annual Occupancy Certificate form and assessing occupancy inspection fees on Plaintiffs and class members for failure to return the Annual Occupancy Certificate.

99.    Defendant's contract with Plaintiffs and the class members did not give Defendant the authority to declare Plaintiffs and the class members in default for failing to return the Annual Occupancy Certificate.

100.    Defendant also evaded the spirit of the contract by assessing occupancy inspection fees on a monthly basis regardless of the outcome of the inspection and by assessing foreclosure-related fees for purported non-occupancy regardless of the outcome of the inspection.  The contract only allowed Defendant to assess "reasonable" inspection fees to preserve the property serving as collateral for the HECM loans.  Assessing such fees on a monthly basis, regardless of the outcome of the inspection is not reasonable, particularly in view of the fact that Champion deemed one Annual Occupancy Inspection form an adequate basis for proving occupancy.

101.    Nor was it reasonable for Champion to conduct occupancy inspections by drive-by.  According to HUD guidance, a drive by inspection—in and of itself—is not an appropriate inspection for determining occupancy.

102.    Defendant further evaded the spirit of its contract with Plaintiffs and class members by failing to notify Plaintiffs or class members prior to conducting each inspection. According to HUD guidance, Defendant should have attempted to contact Plaintiffs and class members by phone or otherwise prior to conducting the repeated inspections.

103.    In addition, Defendant evaded the spirit of the contract by calling Plaintiffs and class members' loans due and payable for failure to return an Annual Occupancy Certificate and assessing foreclosure-related fees as a result of the purported default.

104.    Defendant engaged in this conduct in bad faith or at a minimum was arbitrary and capricious.

105.    Plaintiffs and class members have been damaged as a result of Defendant's breach of the covenant of good faith and fair dealing.

## COUNT 3:  VIOLATION OF THE D.C. MORTGAGE LENDER AND BROKER ACT

106.    Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

107.    Plaintiff Hoggard and D.C. class members are "borrowers" as defined in the D.C. Mortgage Lender and Broker Act (MLBA).  D.C. Code § 26-1101(1).

108.    Plaintiff Hoggard and D.C. class members' HECM loans were "mortgage loans" as defined in the MLBA.  D.C. Code § 26-1101(12).

109.    Defendant is a "mortgage lender" as defined in the MLBA.  D.C. Code § 26-1101(11)(A)(iii) ("mortgage lender" means any person who "Engages is the business of servicing mortgage loans for others. . . .").

110.    Defendant is not a financial institution that accepts deposits or regulated under Title 26 of the D.C. Code.  D.C. Code § 26-1102.

111.    The MLBA prohibits mortgage lenders from:  (i) "directly or indirectly employ[ing] any scheme, device, or artifice to defraud or mislead borrowers," (ii) "engag[ing] in any unfair or deceptive practice toward any person," (iii) "fail[ing] to make disclosures as required by . . . any . . . applicable federal or District law," or (iv) "fail[ing] to truthfully account for monies belonging to a party to residential mortgage loan transaction."  D.C. Code § 26-1114(d)(1), (2), (7), (14).

112.    Defendant violated the MLBA by declaring Plaintiff Hoggard and D.C. class members in default on their HECM loans for failure to return the Annual Occupancy Certificate form and assessing occupancy inspection fees and foreclosure-related fees on Plaintiff Hoggard and D.C. class members for failure to return the Annual Occupancy Certificate.

113.    Defendant violated the MLBA by assessing occupancy inspections fees on a monthly basis regardless of the outcome of the inspections and by failing to provide Plaintiff Hoggard and D.C. class members notice of each occupancy inspection before conducting each inspection.

114.    Defendant violated the MLBA by using drive-by inspections as the sole means for determining occupancy.

115.    Defendant's conduct constitutes a scheme or artifice to defraud or mislead borrowers; an unfair or deceptive practice; a failure to make disclosures required by federal or District law; and a failure to truthfully account for moneys belonging Plaintiff Hoggard and D.C. class members prohibited by the MLBA.

116.    Plaintiff Hoggard and D.C. class members suffered losses as a result of Defendant's MLBA violations and are therefore entitled to recover damages and restitution, as well as attorneys' fees. D.C. Code § 26-1118(e).

**COUNT 4:  VIOLATION OF D.C. CONSUMER PROTECTION PROCEDURES ACT**

117.    Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

118.    Plaintiff Hoggard and D.C. class members are "consumers" with the meaning of the D.C. Consumer Protection Procedures Act (CPPA).  D.C. Code § 28-3901(a)(2).

119.    Champion engaged in unlawful trade practices in violation of the CPPA by engaging in the acts and conduct alleged herein.  Champion's unlawful trade practices include, but are not limited to:  (i) misrepresenting a material fact that has a tendency to mislead; (ii) representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; (iii) failing to state a material fact that has a

tendency to mislead; and (iv) using innuendo or ambiguity as to a material fact that has a tendency to mislead.  D.C. Code § 28-3904(e), (e-1), (f), and (f-1).

120.    Champion misrepresented a material fact that had a tendency to mislead because it *inter alia* represented in its contract with Plaintiff Hoggard and D.C. class members that it would provide them reasonable notice before conducting each inspection.  It did not provide reasonable notice prior to conducting each occupancy inspection.

121.    Champion represented that a transaction confers or involves rights, remedies, or obligations which it does not have or which are prohibited by law by *inter alia* declaring Plaintiff Hoggard and D.C. class members in default for allegedly failing to return an Annual Occupancy Certificate form, failing to provide reasonable notice prior to conducting each occupancy inspection, assessing inspection fees and foreclosure-related fees for allegedly failing to return an Annual Occupancy Certificate form, and conducting repeated occupancy inspections on a drive-by basis regardless of the outcome of the inspections.

122.    Champion failed to state a material fact that had a tendency to mislead by *inter alia* failing to provide reasonable notice prior to conducting each occupancy inspection and failing to state in its contract with Plaintiff Hoggard and D.C. class members that failure to return an Annual Occupancy Certificate would be deemed a default under the contract.

123.    Champion used innuendo or ambiguity as to a material fact that had a tendency to mislead by *inter alia* failing to state in its contract that failure to return an Annual Occupancy Certificate would be deemed a default under its contract with Plaintiff Hoggard and D.C. class members and failing to provide reasonable notice prior to conducting each occupancy inspection.

124.    Plaintiff Hoggard and D.C. class members suffered damages as a result of Defendant's CPPA violations.  Plaintiff Hoggard and D.C. class members are entitled to recover treble damages, $1,500 per CCPA violation, attorneys' fees, and punitive damages.  Plaintiff

Hoggard and D.C. class members are also entitled to an injunction against Defendant's use of the unlawful trade practices described herein.

### COUNT 4:  VIOLATION OF FLORIDA MORTGAGE LENDING LAW

125.    Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

126.    Plaintiff Patton and Florida class members are "borrowers" as defined in Fla. Stat. § 494.001(1).

127.    Plaintiff Patton and Florida class members' HECM loans were "mortgage loans" as defined in Fla. Stat. § 494.001(23).

128.    Defendant is a "mortgage lender" as defined in Fla. Stat. § 494.001(22).

129.    Fla. Stat. § 494.0025 prohibits mortgage lenders from: (i) "knowingly or willingly employ[ing] any device, scheme, or artifice to defraud," (ii) "engag[ing] in any transaction, practice, or course of business which operates as a fraud upon any person in connection with the purchase or sale of any mortgage loan," and (iii) obtain[ing] property by fraud, willful misrepresentation of a future act, or false promise.

130.    Defendant violated Fla. Stat. § 494.0025 by declaring Plaintiff Patton and Florida class members in default on their HECM loans for failure to return the Annual Occupancy Certificate form and assessing monthly occupancy inspection fees and foreclosure-related fees on Plaintiff Patton and Florida class members for failure to return the Annual Occupancy Certificate, regardless of the outcome of the inspection.

131.    Defendant's conduct constitutes a scheme or artifice to defraud or mislead borrowers; a fraud; and a willful misrepresentation.

132.    Plaintiff Patton and Florida class members suffered losses as a result of Defendant's violations and are therefore entitled to recover damages and restitution, as well as attorneys' fees.

## COUNT 5:  VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

133.    Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

134.    Plaintiff Patton and Florida class members are "consumers" as defined by Florida Statute § 501.203(7), and the subject reverse mortgages are "trade or commerce" as defined by Florida Statute §501.203(8).

135.    Champion engaged in unlawful trade practices in violation of the FDUTPA by engaging in the acts and conduct alleged herein. Specifically, Champion's conduct was unfair, deceptive and unconscionable by, *inter alia*, declaring Plaintiff Patton and Florida class members in default for allegedly failing to return an Annual Occupancy Certificate form, failing to inform Plaintiff Patton and the class that they may be put into default and foreclosure for failure to return an Annual Occupancy Certificate form at the time they entered into the reverse mortgage, assessing inspection fees for failing to return an Annual Occupancy Certificate form,  assessing multiple inspection fees regardless of the outcome of the inspection, conducting occupancy inspections on a drive-by basis, and by putting consumers in foreclosure for failing to return an Annual Occupancy Certificate form even when Champion knows the borrower is occupying the property.

136.    Plaintiff Patton and Florida class members suffered damages as a result of Defendant's FDUTPA violations.  Plaintiff Patton and Florida class members are entitled to recover damages, statutory damages, attorneys' fees, and punitive damages.  Plaintiff Patton and

Florida class members are also entitled to an injunction against Defendant's use of the unlawful trade practices described herein.

## COUNT 6:  UNJUST ENRICHMENT

137.    Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

138.    Plaintiffs and class members conferred a benefit on Defendant.  Namely, equity in Plaintiffs' and class members' homes was converted to fees recoverable by Defendant when Plaintiffs' and class members' homes are sold.

139.    Defendant's retention of this benefit was unjust because the occupancy inspection fees and foreclosure-related fees were unreasonable and unlawful.

140.    Plaintiffs and class members are entitled to restitution and Defendant is required to disgorge the benefits it unjustly obtained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.  An order certifying the Classes and appointing Plaintiffs and their counsel to represent the Classes;

B.  Monetary relief and/or equitable relief in an amount to be determined at trial;

C.  Statutory damages, including treble damages;

D.  Punitive or Exemplary damages;

E.  Interest;

F.  Attorneys' fees and costs of suit, including costs of notice, administration, and expert witness fees; and

G.  Such other legal or equitable relief, including injunctive and/or declaratory relief, as the Court may deem appropriate.

28

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.


Dated:  September 29, 2017                Respectfully submitted,

                                          _/s/ Andrea R. Gold_____
                                          Andrea Gold [DC Bar No. 502602]
                                          Sophia Goren [DC Bar No. 1044723]
                                          TYCKO & ZAVAREEI LLP
                                          1828 L Street N.W., Suite 1000
                                          Washington, DC  20036
                                          (202) 973-0900 (telephone)
                                          (202) 973-0950 (fax)
                                          agold@tzlegal.com
                                          sgoren@tzlegal.com

                                          *Attorneys for Plaintiffs and the putative
                                          classes*