**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLENDALE HOGGARD et al.,

    *Plaintiffs*,

    v.

NATIONSTAR MORTGAGE LLC,

    *Defendant*.

Civil Action No. 17-99 (TJK)
**UNDER SEAL**

**MEMORANDUM OPINION**

Plaintiffs Glendale Hoggard and Linda Patton sued Defendant Nationstar Mortgage LLC d/b/a Champion Mortgage Company—Champion, for short—alleging that Champion wronged them and similarly situated individuals while servicing their reverse mortgages.  Plaintiffs move to certify three classes.  Champion opposes and moves to strike the testimony and report of the expert witness on whom Plaintiffs rely in their class-certification motion.  The Court finds that Plaintiffs lack standing to represent the putative classes, that common issues do not predominate in any of the putative classes, and that it is unnecessary to strike the testimony and report of Plaintiffs' expert to reach these conclusions.  Thus, the Court will deny Plaintiffs' motion for class certification, deny as moot Champion's motion to strike, and remand this case to the Superior Court of the District of Columbia from which it was removed.

**I.    Factual Background**

When they filed their operative complaint, Plaintiffs Glendale Hoggard and Linda Patton ("Plaintiffs") were citizens and residents of Washington, D.C., and Florida, respectively.  ECF No.

24 ¶¶ 11, 12, 46, 62; *cf.* ECF No. 70-2 at 7 n.1.[1]  Champion is a Delaware LLC and a citizen of Delaware and Texas.  ECF No. 1-0 ¶ 2.  Champion has serviced reverse mortgages since around December 2011.  ECF No. 24 ¶ 29; ECF No. 77-3 at 62 ¶ 6.

In 2010, Plaintiffs took out reverse mortgages on their respective homes.  ECF No. 24 ¶¶ 1, 47, 63.  Generally, with reverse mortgages, the lender advances funds secured by the borrower's home to the borrower at the start of the loan, and the loan becomes due when the borrower dies, sells the home, or permanently vacates it.  *Id.* ¶ 17.  The borrower does not make periodic payments on the loan; instead, the loan balance increases over time because of accruing interest and fees that the lender or servicer may assess to the loan balance.  *See id.* ¶¶ 17, 27–28.

There are different types of reverse mortgages, but the type at issue here is the home-equity conversion mortgage ("HECM").  *Id.* ¶¶ 18, 47, 63, 79.  The Department of Housing and Urban Development ("HUD"), through the Federal Housing Administration, regulates and insures HECMs.  *See* 12 U.S.C. §§ 1701c, 1715b; 42 U.S.C. § 3535(d); 24 C.F.R. § 206.1 *et seq.*  Lenders seek this insurance purportedly because it ensures that they will be repaid "in full," including for interest and costs that they assess to the loan balance, when the loan becomes due, even if the loan balance exceeds the value of the home.  ECF No. 24 ¶¶ 18, 43.[2]

Plaintiffs each obtained an HECM in 2010, and Bank of America, N.A., served as the lender for both loans.  *Id.* ¶¶ 47, 63.  Plaintiffs each received full disbursement of their loans at origination.  *Id.*  Bank of America later assigned these loans to Champion.  *Id.* ¶¶ 48, 64.

---

[1] To resolve the pending motions, the Court accepts as true any undisputed facts or background facts.  *Cf. Parker v. Bank of Am., N.A.*, 99 F. Supp. 3d 69, 80 (D.D.C. 2015) ("[C]ourts are permitted to make factual findings to the extent necessary to rule on a motion for class certification.").

[2] Lenders may not always be repaid "in full."  *See* ECF No. 77-3 at 62–63 ¶¶ 10–11.  But the Court need not resolve this question to decide the pending motions.

Plaintiffs' loan documents conformed to the standard templates HUD provides for HECMs. *See* ECF No. 24 ¶ 20; ECF No. 77-3 at 14; *see generally* HUD, *Single Family Mortgages Model Documents*, https://www.hud.gov/program_offices/housing/sfh/model_documents (last accessed December 27, 2021); 24 C.F.R. § 206.27(a)–(c).  These documents contain several provisions relevant here.  First, the documents specify that the loans are nonrecourse—that is, the borrower has "no personal liability" on the outstanding mortgage balance and the lender can enforce the debt only through sale of the home.  ECF No. 70-3 at 10 ¶ 4(C), 163 ¶ 4(C); *see also* 12 U.S.C. § 1715z-20(d)(7); 24 C.F.R. § 206.27(b)(8).  Second, the documents require the borrower to use the home securing the HECM as her "principal residence."  ECF No. 70-3 at 10–11 ¶ 6(B)(i), 163–64 ¶ 6(B)(i); *see also* 12 U.S.C. § 1715z-20(d)(3); 24 C.F.R. §§ 206.3, 206.39(a).  Third, they permit the lender or its agent to "inspect or make appraisals" of the home "in a reasonable manner and at reasonable times" so long as the lender gives the borrower "notice prior to any inspection or appraisal" and gives a reason for the inspection or appraisal related to the lender's interest in the property.  ECF No. 70-3 at 15 ¶ 6, 168 ¶ 6.  Fourth, they contain a choice-of-law provision specifying that the HECMs are "governed by Federal law and the law of the jurisdiction in which the [home] is located."  ECF No. 70-3 at 18 ¶ 17, 172 ¶ 17.  Fifth, they specify that the lender can require immediate payment in full (through foreclosure) of the loan balance if the borrower fails to perform an obligation owed under the HECM.  ECF No. 70-3 at 28 ¶ 6(B)(iii), 169 ¶ 9(B)(iii).

Also, although the documents have no express term to this effect, regulations in force when Plaintiffs obtained their HECMs obligated lenders to require borrowers to "make an annual certification" of their "principal residence."  *See* 24 C.F.R. § 206.211 (Apr. 1, 1990).[3]  Similarly, since

---

[3] Ordinarily, existing laws or regulations "enter into and form a part" of a contract "as if they had

3

1994, HUD guidance has required HECM borrowers to certify annually in writing on a form pro-
vided by the lender that the home securing the mortgage is their "principal residence," though this
requirement was not incorporated into the HUD HECM templates until February 2015 and was
not adopted as a regulation until 2017.  *See* HUD Handbook 4330.1 (REV-5), § 13-22(A) (Sept.
29, 1994); ECF No. 70-3 at 415 ¶ 6.3; *Federal Housing Administration: Strengthening the Home
Equity Conversion Mortgage Program*, 82 Fed. Reg. 7,094, 7,127 (Jan. 19, 2017).

Thus, Champion routinely sent an "Annual Occupancy Certificate" to the borrowers of the
HECMs it serviced.  *See* ECF No. 24 ¶ 31; ECF No. 77-3 at 17.  The form explained that the
certification was an annual requirement and asked the borrower to sign and return it to certify her
principal residence.  *E.g.*, ECF No. 76-3 at 57.  If the borrower did not do so, Champion would
send the borrower a "2nd Notice" form.  *See* ECF No. 24 ¶ 32; ECF No. 77-3 at 17.  This form
explained again that the certification was an annual requirement, warned that the borrower "may
be in default" if she did not return the form, advised that Champion would send someone to the
home to investigate occupancy status if the form was not returned, and stated that Champion would
add the cost of this inspection to the loan balance.  *See* ECF No. 24 ¶ 32; ECF No. 76-3 at 59, 126.

At times, Champion had a uniform policy of placing a loan into an unreturned-occupancy-
certificate default status if the borrower did not return the Annual Occupancy Certificate after
being sent the 2nd Notice.  *See* ECF No. 70-3 at 316, 374, 385–86; ECF No. 77-8 at 415–16.[4]
Champion would then try to contact the borrower via telephone and mail and would have a third

---

been expressly referred to or incorporated in its terms."  *Norfolk & W. Ry. Co. v. Am. Train Dis-
patchers Ass'n*, 499 U.S. 117, 130 (1991); *Rehart v. Clark*, 448 F.2d 170, 173 (9th Cir. 1971).

[4] Plaintiffs point out that the record is unclear and sometimes conflicting as to when Champion
ceased some of these practices.  *See* ECF No. 70-2 at 24, 26–27, 27 n.10.  The Court need not
resolve these issues to decide the pending motions.

party inspect the property monthly to determine its occupancy status. *See* ECF No. 70-3 at 301–05, 386–87; ECF No. 77-3 at 67 ¶ 30; *see, e.g.*, ECF No. 76-3 at 86–91, 156–60. These third-party inspectors would report to Champion the results of each inspection. ECF No. 70-3 at 310–12; *see, e.g.*, ECF No. 76-3 at 86–91. Before 2015, Champion retained these inspection results only in each borrower's individual loan file. ECF No. 70-3 at 363 ¶ 12. In mid-2015, however, Champion began keeping a global spreadsheet of inspection results. *Id.* at 363 ¶ 10.

Generally, even if an inspection found occupancy, Champion would not stop inspections or restore a loan in unreturned-occupancy-certificate default status back to good standing. *See* ECF No. 70-3 at 275, 278, 307, 320–21, 344–45. Instead, the borrower had to return the Annual Occupancy Certificate to cure the default and end the monthly inspections. *See* ECF No. 70-3 at 285–86, 374–76, 368 ¶ 7. If a loan remained in unreturned-occupancy-certificate default status for more than ninety days, Champion would take steps to place the loan into due-and-payable status. *See* ECF No. 70-3 at 368 ¶ 7, 375. Once the loan was in due-and-payable status, Champion would have the home appraised. ECF No. 70-3 at 322, 333. If a loan remained in due-and-payable status for ninety days, Champion would foreclose on the home, incurring various expenses in the foreclosure process. *See* ECF No. 70-3 at 288–90, 296. Champion would assess to the borrower's loan balance the costs of the monthly inspections, the appraisal, and the foreclosure-related expenses. ECF No. 70-3 at 291–95, 307; ECF No. 77-3 at 63–64 ¶¶ 15–16. These costs could add several thousand dollars to a borrower's loan balance. *See, e.g.*, ECF No. 70-2 at 19, 22.

Plaintiffs and putative class members are HECM borrowers who had loans serviced by Champion, who failed to return the Annual Occupancy Certificate to Champion sometime during the life of the loan, and whose loans were placed in default by Champion for this reason. *See* ECF

No. 70-2 at 8.  Plaintiffs contend that Champion breached the loan agreements and acted unlaw-
fully by placing their loans into unreturned-occupancy-certificate default status for that reason and
by assessing to their loan balances the costs flowing from this default status.  *See id.* at 15.  Plain-
tiffs allege that Champion's misconduct harmed them and putative class members by causing them
to lose equity in their homes that is realized as lost profit when their homes are sold.  ECF No. 24
¶¶ 7–8, 44, 61, 77, 138; ECF No. 70-2 at 8, 26; *see also* ECF No. 77-3 at 63–64 ¶¶ 15–19.

## II.    Procedural Background

Hoggard filed a class-action complaint against Champion in the Superior Court of the Dis-
trict of Columbia, which Champion removed to this Court under 28 U.S.C. §§ 1332(d), 1441(a),
and 1451(1).  *See* ECF No. 1-1 at 6; ECF No. 1-0 ¶¶ 10–11.  Following removal, Plaintiffs filed
an amended class-action complaint asserting seven counts: (1) breach of contract; (2) breach of
the implied covenant of good faith and fair dealing; (3) violations of the District of Columbia
Mortgage Lender and Broker Act, *see* D.C. Code §§ 26-1101, 26-1114; (4) violations of the Dis-
trict of Columbia Consumer Protection Procedures Act, *see* D.C. Code §§ 28-3901, 28-3904;
(5) violations of Florida's mortgage-lending law, *see* Fla. Stat. §§ 494.001, 494.0025; (6) viola-
tions of the Florida Deceptive and Unfair Trade Practices Act, *see* Fla. Stat. §§ 501.201, 501.204;
and (7) unjust enrichment.  *See* ECF No. 24 ¶¶ 89–140.  Each count is based on the same basic
theory: Champion wrongly treated the failure to return an Annual Occupancy Certificate as a de-
fault under the HECMs because no provision in the HECMs required borrowers to return that form,
and in doing so Champion itself breached the HECMs, committed other common-law wrongs, and
violated state consumer-protection statutes.

Following class discovery, *see* Minute Order of July 9, 2019, Plaintiffs move for class certification under Federal Rule of Civil Procedure 23(a) and (b)(3), *see* ECF No. 71; ECF No. 70-2 at 8–9. Plaintiffs define the three classes they ask the Court to certify as follows:

- **Nationwide Class:** All residents of the United States of America who (a) had a HECM loan closed prior to February 1, 2015, (b) serviced by Champion, (c) whose loan was declared by Champion to be in default for failure to return an Annual Occupancy Certificate, and (d) whose loan was assessed more than one occupancy inspection fee, one or more appraisal fee(s), and/or foreclosure fee(s).
- **District of Columbia Subclass:** All residents of the District of Columbia who (a) had a HECM loan secured by a property in the District of Columbia closed prior to February 1, 2015, (b) serviced by Champion, (c) whose loan was declared by Champion to be in default for failure to return an Annual Occupancy Certificate, and (d) whose loan was assessed more than one occupancy inspection fee, one or more appraisal fee(s), and/or foreclosure fee(s).
- **Florida Subclass:** All residents of Florida who (a) had a HECM loan secured by a property in Florida closed prior to February 1, 2015, (b) serviced by Champion, (c) whose loan was declared by Champion to be in default for failure to return an Annual Occupancy Certificate, and (d) whose loan was assessed more than one occupancy inspection fee, one or more appraisal fee(s), and/or foreclosure fee(s).

ECF No. 70-2 at 8–9.[5] The Nationwide Class asserts the counts for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment ("Common Law Counts"). ECF No. 24 ¶¶ 90–91, 95, 98, 138, 140. The District of Columbia Subclass asserts the Common Law Counts plus the two District of Columbia statutory counts. *Id.* ¶¶ 90–91, 95, 98, 107, 116, 118, 124, 138, 140. And the Florida Subclass asserts the Common Law Counts plus the two Florida statutory counts. *Id.* ¶¶ 90–91, 95, 98, 126, 132, 134, 136, 138, 140. Both Plaintiffs

---

[5] Plaintiffs proposed these class definitions in their Motion for Class Certification, which modified the class definitions proposed in their amended complaint. *See* ECF No. 24 ¶ 79. Champion does not contest these modified class definitions, so the Court treats them as the operative class definitions. *Cf. In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 256 (D.D.C. 2002) (allowing the plaintiffs to modify their proposed class definitions via their reply to their motion for class certification).

seek to be appointed representatives of the Nationwide Class, Hoggard seeks to be appointed representative of the District of Columbia Subclass, and Patton seeks to be appointed representative of the Florida Subclass.  *See* ECF No. 70-2 at 9.[6]

Champion opposes class certification.  *See* ECF No. 76.  Champion also moves to strike the testimony and report of Plaintiffs' expert, on whom they rely in their class-certification motion. *See* ECF No. 75; ECF No. 70-2 at 36–37.

### III.    Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted).  Thus, class certification is "far from automatic."  *In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869*, 725 F.3d 244, 249 (D.C. Cir. 2013). The proponents of class certification must "affirmatively demonstrate" that they have satisfied the Rule 23(a) requirements and at least one of the Rule 23(b) requirements.  *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 311 (D.D.C. 2018).  And Plaintiffs acknowledge that they must show this by a preponderance of the evidence.  ECF No. 79-2 at 8; *see Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 43 (D.D.C. 2018).

All class actions must satisfy Rule 23(a)'s four requirements: (1) the proposed class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representatives are typical of the claims or defenses of the class; and (4) the representatives will fairly and adequately protect the interests of the class.  *See Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 482 (D.D.C. 2019).  And under Rule

---

[6] Patton lived in Florida "at all times relevant to the litigation" but has since relocated to Virginia. ECF No. 70-2 at 7 n.1.

23(b)(3)—the only subdivision of Rule 23(b) under which Plaintiffs seek certification—the proponent of class certification must show that (1) the questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Before certifying a class, the Court "must undertake a 'rigorous analysis' to confirm" that the proponents of class certification have carried their burden to show that they satisfy the requirements of Rule 23.  *See C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 201 (D.D.C. 2020) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  The Court "exercises broad discretion in deciding whether plaintiffs have carried their burden." *Steele v. United States*, 159 F. Supp. 3d 73, 79 (D.D.C. 2016) (citing *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994)).

## IV.   Analysis

Champion argues that Plaintiffs have failed to satisfy the commonality requirement of Rule 23(a)(2), the typicality requirement of Rule 23(a)(3), the adequacy requirement of Rule 23(a)(4), the predominance requirement of Rule 23(b)(3), and the superiority requirement of Rule 23(b)(3). ECF No. 77-3 at 30, 35, 50.  The Court agrees that Plaintiffs have not carried their burden as to the typicality, adequacy, and predominance requirements, and it will deny their motion for class certification on these grounds. *See, e.g.*, *Parker*, 99 F. Supp. 3d at 89–90.

### A.   Typicality and Adequacy

Champion argues that Plaintiffs are not typical and adequate representatives—two often "intertwined" Rule 23(a) requirements, *Swanson v. Lord & Taylor LLC*, 278 F.R.D. 36, 40 (D. Mass. 2011)—because they lack standing.  ECF No. 77-3 at 50–51.  The Court agrees.

The proposed representatives of a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which

they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Thus, as a "prerequisite to Rule 23 class certification," at least one proposed class representative must have Article III standing to assert each claim raised. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 108 (D.C. Cir. 2002); *J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019). And, at the class-certification stage, "evidentiary proof" is required to establish standing. *Gomez v. Trump*, No. 20-cv-1419 (APM), 2020 WL 3429786, at \*6 (D.D.C. June 23, 2020); *accord Stephenson Oil Co. v. Citgo Petroleum Corp.*, 271 F.R.D. 323, 333 (N.D. Okla. 2010) (collecting authorities).

It is not clear under which provision of Rule 23(a) the question of a class representative's standing is properly classified. Some courts have treated the question as going to the typicality requirement. *See, e.g.*, *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Other courts have treated it as part of the adequacy requirement. *See, e.g.*, *Brewer v. Holder*, 20 F. Supp. 3d 4, 14 (D.D.C. 2013). And others treat it as an implicit "threshold" requirement. *See, e.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 22 (D.D.C. 2001).

In any event, the elements of standing are the same. Plaintiffs must have an "injury in fact" that is "concrete and particularized" and "actual or imminent"; the injury in fact must be "fairly traceable to the challenged action" of Champion; and the injury must likely be redressable by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

Neither Hoggard nor Patton has suffered an "injury in fact." In their operative complaint and motion for class certification, Plaintiffs claim that their injury is "lost equity" resulting in lost profit. In essence, they claim that the disputed costs Champion assessed to their loan balances will reduce or eliminate the proceeds they otherwise would receive once their homes are sold because Champion will take more money from the sale than it rightfully may take to be reimbursed for

these costs.  *See* ECF No. 24 ¶¶ 8–9, 44, 61, 77, 138; ECF No. 70-2 at 8, 26, 34; *see, e.g.*, *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 74 n.1 (D.D.C. 2015).  But because HECMs are nonrecourse, the only scenario in which this injury can come to fruition is one in which a borrower's home sells for more than what the outstanding loan balance would have been had Champion not assessed the disputed costs to the loan balance.  In that scenario, the borrower's sale proceeds are reduced or eliminated because Champion takes some or all those proceeds as reimbursement for the disputed costs.  But when a borrower's home sells for less than or equal to what the outstanding loan balance would have been had Champion not assessed the disputed costs, there is no realized "lost equity" because the borrower would get nothing from the sale anyway and Champion cannot sue the borrower for any outstanding amounts.

Plaintiffs have identified nothing in the record showing that their "lost equity" injury is "actual or imminent."  *See Lujan*, 504 U.S. at 560.  And what record evidence the Court finds on this point shows that Plaintiffs' injury is too "speculative for Article III purposes."  *See id.* at 564 n.2; *Collins v. U.S. Bank, Nat'l Ass'n*, No. 2:14-cv-07726 (JPR), 2015 WL 470289, at *4–5 (C.D. Cal. Feb. 3, 2015) (concluding that a forward mortgage borrower lacked standing under a "foreclosure-surplus theory" of injury because there was no profit from the foreclosure that would have gone to the borrower but for the lender's actions).

For instance, in 2014 Hoggard's home was appraised at $315,000.  *See* ECF No. 70-3 at 63.  But by July 2016, his loan balance totaled more than $325,000 and was growing by more than $1,500 a month because of accruing interest and financing fees.  *See* ECF No. 70-3 at 159.  Yet Hoggard identifies only $1,367.46 in fees, plus interest on those fees accruing at 5.56% per year, that he claims Champion wrongly assessed to his loan balance.  ECF No. 70-2 at 22; ECF No. 70-3 at 10.  Thus, when Hoggard's home is sold, a significant outstanding balance will remain apart

from the disputed costs included in his loan balance.  Hoggard, then, will never realize any "lost equity."

Similarly, in 2014 Patton's home was appraised at $135,000.  *See* ECF No. 70-3 at 201. But by May 2015, her loan balance totaled more than $134,000 and was growing by more than $600 a month because of accruing interest.  *See* ECF No. 70-3 at 255.  Yet Patton identifies only $3,293 in fees, plus interest on those fees accruing at 5.49% per year, that she claims Champion wrongly assessed to her loan balance.  ECF No. 70-2 at 19; ECF No. 70-3 at 163.  Patton, then, also will never realize any "lost equity."  In fact, Patton relocated to Virginia after joining this case but before moving for class certification, at which time her loan servicer (Champion had assigned her loan to a third party) had the right to foreclose on her Florida home.  ECF No. 24 ¶¶ 12, 62; ECF No. 70-2 at 7 n.1; ECF No. 70-3 at 164 ¶ 6(B)(i); ECF No. 77-3 at 63 ¶ 13.  Yet, tellingly, Patton has produced no evidence showing that she realized any "lost equity" after moving out of her home.  *Cf. TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021) ("The production of weak evidence [of standing] when strong is available can lead only to the conclusion that the strong would have been adverse." (internal quotation marks omitted)).

Also, even if Patton had produced evidence that she suffered this "lost equity" injury, the record shows that she faces other standing hurdles because this injury is neither "fairly traceable" to Champion's disputed fees nor is it likely redressable by a favorable decision about the wrong-fulness of Champion's conduct.  *See Lujan*, 504 U.S. at 560–61.  A plaintiff "cannot satisfy the 'fairly traceable' requirement" when a sufficient cause independent of the defendant's challenged conduct would have inflicted the injury.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013); *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015) (per curiam).  And a plaintiff cannot satisfy the redressability requirement when a favorable judicial decision "will have

no real effect" on redressing the injury, such as when there is a sufficient cause for the injury that would exist even if defendant's challenged conduct had never occurred.  *See Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018); *Delta Constr.*, 783 F.3d at 1297; *Von Aulock v. Smith*, 720 F.2d 176, 180 (D.C. Cir. 1983).

According to Patton's loan files in the record, Patton defaulted on her loan by failing to pay taxes and insurance on her home around the same time that Champion placed her loan in unreturned-occupancy-certificate default status.  *See* ECF No. 70-3 at 241, 252–53, 256.  All the disputed costs that Champion assessed to her loan balance for inspections, an appraisal, and fore-closure were incurred after this "Tax or Insurance" default.  *See* ECF No. 70-3 at 241–53; ECF No. 70-2 at 37–38 & n.12.  Patton does not dispute the validity of this "Tax or Insurance" default, which appears to have persisted until Champion transferred her loan to the third-party servicer. *See* ECF No. 70-3 at 241; ECF No. 77-3 at 63 ¶ 13.  And this default gave Champion an independ-ent reason to conduct inspections, order an appraisal, and commence foreclosure.  *See* ECF No. 24 ¶ 25; ECF No. 70-3 at 164 ¶¶ 6(B)–(C), 167 ¶¶ 2–3, 6; ECF No. 77-8 at 474–76, 490–91.  Thus, Patton's "lost equity" injury would remain even if she prevailed in this case.  Her injury therefore fails the traceability and redressability elements of standing.

In its opposition to class certification, Champion pointed out these issues with Plaintiffs' standing.  ECF No. 77-3 at 27–28, 50–51.  In response, Plaintiffs effectively ignored these issues and instead tweaked how they characterize their injury, claiming that the injury is not "lost equity" that they have realized or will realize but "increased indebtedness" on their loan balances flowing from Champion's allegedly wrongful conduct.  *See* ECF No. 79-2 at 7, 17–19.  The Court need not credit this belated change.  *See, e.g.*, *Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 204

n.4 (D.D.C. 2016).  But even if the Court did, Plaintiffs still fail to establish standing because this purported injury lacks concreteness.  *See Lujan*, 504 U.S. at 560.

The concreteness component of the injury-in-fact element of standing requires that the injury "be '*de facto*'; that is, it must actually exist."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).  To be sure, an intangible injury can be concrete, but, whether the injury is tangible or intangible, concreteness requires that the injury be "real," not "abstract."  *See id.*  So, for instance, inaccurate credit information in a consumer's credit file is not by itself a sufficiently concrete injury; that inaccurate information either must be shared so as to result in a real injury (such as a denial of credit) or must otherwise cause actual harm.  *See TransUnion*, 141 S. Ct. at 2209–12. Otherwise, the inaccurate credit information is, for standing purposes, a paper tiger—perhaps foreboding but ineffectual as an Article III injury in fact.  *See id.*

So too is Plaintiffs' "increased indebtedness" injury.  Because HECMs are nonrecourse, the slight increase in Plaintiffs' loan balances from the disputed fees creates an abstract debt, one that Hoggard likely will never have to pay and one that Patton apparently did not have to pay. Thus, Plaintiffs' "increased indebtedness" does not give them standing.  *See, e.g.*, *Sandlin v. Shapiro & Fishman*, 168 F.R.D. 662, 667–68 (M.D. Fla. 1996) (holding that two forward mortgage borrowers did not have standing because they did not pay the disputed fee "nor were they ever required to pay the fee").

This is not to say that a plaintiff's nonrecourse "increased indebtedness" could never cause a sufficiently concrete injury for standing purposes.  One can imagine injuries flowing from such increased debt that potentially would satisfy the concreteness requirement, such as the plaintiff paying the nonrecourse debt or suffering real collateral consequences.  *See, e.g.*, *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1066 (7th Cir. 2020); *DiGiacomo v. Statebridge Co.*, No. 14-

14

cv-6694 (JEI), 2015 WL 3904594, at *4 (D.N.J. June 25, 2015). But Plaintiffs have not alleged or argued, let alone shown, that they suffered or will imminently suffer these sorts of injuries because of their "increased indebtedness." *See generally* ECF No. 79-2 at 17–19.[7]

In short, neither Hoggard nor Patton has established Article III standing to pursue any of the claims they assert. Whether this means that Plaintiffs have failed a threshold requirement to Rule 23, the typicality requirement of Rule 23(a)(3), or the adequacy requirement of Rule 23(a)(4), Plaintiffs' lack of standing means that they fail to satisfy at least one of the requirements for class certification for each of the putative classes they seek to represent.

### B.   Predominance

That is not all. Champion also argues that Plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3). *See* ECF No. 77-3 at 35–50. The Court agrees on this point, too.

Rule 23(b)(3)'s predominance requirement is "demanding." *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). It turns on "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). In determining

---

[7] Plaintiffs cite several decisions ostensibly supporting their position that increased debt on a reverse-mortgage loan balance is a sufficient injury in fact by itself for standing purposes. *See* ECF No. 79-2 at 17–19 & n.5. These authorities are largely distinguishable, but, to the extent they conflict with the Court's holding, the Court respectfully declines to follow them. *See Gray v. CIT Bank, N.A.*, No. 18-cv-1520 (RMB/AMD), 2018 WL 6804273, at *6 (D.N.J. Dec. 27, 2018) (asserting—in passing, without analysis, and in a different context—that "increased indebtedness on [a reverse] mortgage" is a "quantifiable, concrete injury"); *DiGiacomo*, 2015 WL 3904594, at *4 (observing that a "charged fee" on a traditional forward mortgage, "though unpaid, *can* constitute injury" (emphasis added)); *Lane v. Wells Fargo Bank, N.A.*, No. C 12-04026 WHA, 2013 WL 3187410, at *1, *11 (N.D. Cal. June 21, 2013) (observing that a class of forward-mortgage borrowers suffered "an economic injury . . . sufficient to confer standing" through the imposition of charges on their loan balances, even if any given borrower had "not yet paid" the charges, but then suggesting that "borrowers who have been excused from payment of their loan, and associated expenses, such as through foreclosure" would not have standing).

whether common issues predominate, "courts must take into account the claims, defenses, relevant facts, and applicable substantive law, to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." *In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 422 F. Supp. 3d 194, 243 (D.D.C. 2019) (brackets omitted). "Meeting the predominance requirement demands more than common evidence" that the defendant acted wrongfully—the plaintiffs seeking class certification "must also show that they can prove, through common evidence, that all class members were in fact injured" by the defendant's actions. *See In re Rail Freight Fuel Surcharge*, 725 F.3d at 252. Also, "a class cannot be certified on the premise" that the defendant "will not be entitled to litigate" its individual defenses against specific class members. *See Dukes*, 564 U.S. at 367.

The predominance requirement ensures that class certification achieves "economies of time, effort, and expense, and promote[s] uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Fed. R. Civ. P. 23, Advisory Committee Notes to 1966 Amendment. Thus, a district court is within its discretion to deny class certification for lack of predominance if class certification would not "negate the need for a series of mini-trials." *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253, 1256 (2d Cir. 2002) (Sotomayor, J.); *accord Garcia v. Veneman*, 211 F.R.D. 15, 24 (D.D.C. 2002); *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 985 (8th Cir. 2021); *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602, 605 (5th Cir. 2006).

All three putative classes suffer from a lack of predominance. The Court analyzes each putative class in turn.

### 1.     Lack of Predominance in the Nationwide Class

The putative Nationwide Class asserts the Common Law Claims—breach of contract, breach of the implied covenant, and unjust enrichment—against Champion.  Plaintiffs have not shown that the common issues of law or fact in this class will predominate over individual issues.

First, Plaintiffs have not shown that the law in all fifty states and the District of Columbia as to these three claims is sufficiently similar so as to find a predominance of common legal questions.  To show this, proponents of a nationwide class "must creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'"  *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (Edwards and R.B. Ginsburg, JJ.) (quoting *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986)).  This is a "significant burden."  *See In re McCormick & Co.*, 422 F. Supp. 3d at 225 (quoting *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183 (3d Cir. 2014)).

Despite having this "significant burden," in their opening class-certification memorandum Plaintiffs did not even cite a case, let alone "creditably demonstrate" through an "extensive analysis," that state-law variances as to the Common Law Claims do not defeat predominance.  *See generally* ECF No. 70-2.  After Champion pointed out in its opposition filing Plaintiffs' abject failure to carry their burden on this point, *see* ECF No. 77-3 at 36, Plaintiffs responded merely by citing a few cases ostensibly showing that courts "routinely" certify nationwide breach-of-contract and unjust-enrichment classes.  *See* ECF No. 79-2 at 28 & n.9.  But Plaintiffs "must do more than provide their own *ipse dixit*, citation to a similar case, and a generic assessment" of state law to carry their burden.  *See Grandalski*, 767 F.3d at 184; *accord In re McCormick & Co.*, 422 F. Supp. 3d at 225.  And besides, Plaintiffs' citations do not adequately show predominance.

As for the cases ostensibly showing that contract law is sufficiently similar nationwide, none of them contain an extensive analysis of state contract law. *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 126–27 (2d Cir. 2013); *Hanks v. Lincoln Life & Annuity Co. of N.Y.*, 330 F.R.D. 374, 383 (S.D.N.Y. 2019); *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010); *Singer v. AT&T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998). And courts that have undertaken such an analysis have concluded that "nuances of the contract law of fifty states" defeat predominance in a nationwide breach-of-contract class. *See, e.g.*, *Marino v. Home Depot U.S.A., Inc.*, 245 F.R.D. 729, 734–36 (S.D. Fla. 2007).

Plaintiffs cite no authority specifically discussing state-law variances in implied-covenant law. But a case they rely on elsewhere in their class-certification filings suggests that existing variances defeat predominance. *See Lane*, 2013 WL 3187410, at *3–4 (declining to certify a nationwide class asserting a breach-of-implied-covenant claim because of the "multitude of different state law standards" implicated); *accord In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 599–600 (S.D.N.Y. 2018).

As for the cases ostensibly showing that unjust-enrichment law is sufficiently similar nationwide, these do provide some analysis of unjust-enrichment law in several jurisdictions around the country. *See, e.g.*, *Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 20–21 & n.5 (D. Mass. 2010) (involving thirty-four jurisdictions); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 678, 697 & n.40 (S.D. Fla. 2004) (involving nineteen jurisdictions). Even so, many courts considering putative nationwide unjust-enrichment classes have found that state-law variances defeat predominance. *See, e.g.*, *Hanks*, 330 F.R.D. at 385 (collecting authorities); *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 513 (D. Minn. 2014) (collecting authorities); *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 548–49 (C.D. Cal. 2013) (collecting authorities).

Second, individualized fact issues as to each of the three Common Law Claims defeats predominance.

As for the breach-of-contract claim, Plaintiffs acknowledge that proving Champion's breach requires them to establish that class members were occupying their properties at the time Champion moved their loans into unreturned-occupancy-certificate default status and began assessing default-related costs to class members' loan balances. *See* ECF No. 79-2 at 16. But Plaintiffs' common evidence for this point does not prove borrower occupancy, meaning that the "essential" breach element of the breach-of-contract claim is an individualized fact question, rendering class certification "unsuitable." *See Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 22 (D.D.C. 2012) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)); *cf. Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 53 (D.D.C. 2010) (finding predominance in a breach-of-contract class action where the breach element turned on "single acts or omissions" by the defendant "vis-à-vis the class").

Plaintiffs' ostensibly common evidence comes in the form of Champion's business records and Plaintiffs' expert's method for extracting data from those records. *See* ECF No. 70-3 at 450–87; ECF No. 70-2 at 37–38; ECF No. 79-2 at 8–13, 21–23; ECF No. 79-3 at 39–43; ECF No. 79-4 at 13–16. Simply put, Plaintiffs propose having their expert use computer code he wrote to search through Champion's business records and then extract and compile data identifying borrowers whose loans were moved into unreturned-occupancy-certificate default status and assessed default-related costs after Champion received inspection results reporting that the borrower's home was "occupied." Plaintiffs argue that their expert's compilation will provide common proof of borrower occupancy ("occupied" inspection results) and thus of Champion's breach.

But Champion has shown that an "occupied" inspection result from its third-party vendors is not dispositive as to borrower occupancy and that, at a minimum, an individualized and holistic analysis of a borrower's loan file is necessary to determine whether the home was borrower occupied when Champion began assessing the disputed costs to that borrower's loan balance. During class discovery, Champion produced a sample of around 150 loan notes out of thousands of HECMs—at least 14,418, according to Plaintiffs—implicated in this class action. *See* ECF No. 70-2 at 31; ECF No. 79-3 at 102–03.[8] Out of that sample, Champion has identified seventeen, or about 11%, where the loan notes and/or inspection-results file contain "occupied" and sometimes even "owner occupied" inspection results for a home *after* Champion had learned by other means that the borrower had vacated the home. *See* ECF No. 77-3 at 56–58.[9]

In response, Plaintiffs essentially ask the Court to ignore these facts and reject Champion's "post hoc attempt . . . to cast doubt on its own business records" as well as its contention "that resolving questions of class member occupancy requires more than an occupancy inspection result." ECF No. 70-2 at 39; ECF No. 79-2 at 11–13. And they argue that the Court should disregard the demonstrated inadequacies with their common method of proof because Champion itself uses inspection results to make vacancy determinations for purposes of referring loans to foreclosure.

---

[8] Plaintiffs claim that Champion "cherry-picked" these loan notes. ECF No. 79-2 at 23. But one of Champion's witnesses submitted a 28 U.S.C. § 1746 declaration asserting that these loan notes were a "random sample," ECF No. 77-3 at 60 ¶ 2, 70 ¶ 39, and the record supports that claim, *see* ECF No. 79-3 at 102; ECF No. 82 at 9. The Court thus finds no reason to doubt that this sample was random.

[9] Plaintiffs do not dispute the accuracy of this exhibit summarizing around 2,500 pages of material from these seventeen loan files. *See generally* ECF No. 79-2; ECF Nos. 77-3–77-8. The Court thus accepts its contents as true for the purpose of deciding the pending motions. *Cf., e.g., Freedom Watch, Inc. v. Org. of Petrol. Exporting Countries*, 107 F. Supp. 3d 134, 138 n.7 (D.D.C. 2015) (accepting as true the "unchallenged representations" of the defendant that were based on German-language "supporting exhibits").

*See* ECF No. 70-2 at 39; ECF No. 79-2 at 7, 10–13.  In doing so, Plaintiffs rely on several decisions certifying classes in the face of either a defendant's shoddy recordkeeping or the defendant's disingenuous claim that its own records were unreliable.

Even assuming this Court would follow those decisions (none of which are binding), this is not a shoddy-recordkeeping case or one in which the defendant is claiming disingenuously that its own business records are unreliable.  Instead, in this case Champion has shown that determining borrower occupancy requires more than accepting uncritically an "occupied" inspection result because borrowers' loan records often contain ambiguous or conflicting information about borrower occupancy (some of which, like the inspection results, comes from third parties).  That is, Plaintiffs' common proof of breach is too blinkered and thus insufficient for the factfinder's task as to this element.

Champion "has a due process right to raise individual challenges and defenses to claims." *See Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013); *accord In re Asacol Antitrust Litig.*, 907 F.3d 42, 52 (1st Cir. 2018).  Thus, it has a right to litigate any individualized defenses it has against each putative class member, including by producing individualized evidence at trial to rebut a third-party "occupied" inspection result in a borrower's loan file that the borrower relies on to prove borrower occupancy.  *See Dukes*, 564 U.S. at 367.  Plaintiffs essentially ask this Court to deny Champion its due-process right to do so to preserve the predominance of common issues of fact.  However, as the *Dukes* Court rejected the "Trial by Formula" contrived in that case to ameliorate predominance issues at the expense of the defendant's due-process rights, so here the Court must reject Plaintiffs' proposal to ameliorate predominance issues by denying Champion its right to raise individualized defenses.  *See* 564 U.S. at 367.

In short, determining breach here will be a fact-intensive, individualized process, and Champion has a right to litigate its defenses in this way.  Thus, litigating just the issue of breach will require potentially thousands of mini-trials.  Common issues of fact, then, do not predominate as to the Nationwide Class's breach-of-contract claim.  *Cf. In re Rail Freight Surcharge Antitrust Litig.-MDL No. 1869*, 934 F.3d 619, 624 (D.C. Cir. 2019) (affirming the district court's lack-of-predominance finding because "individualized inquiries" were necessary to determine which of several thousand class members, about 12.7% of the total class, "were actually injured").

As for the breach-of-implied-covenant claim, the same issue defeats predominance for this claim as well because in at least some (and "perhaps the majority of") jurisdictions nationwide, a breach-of-implied-covenant claim fails "absent breach of an express term of the contract."  *See* 23 *Williston on Contracts* § 63:22 at n.25 & accompanying text (4th ed. May 2021 update).  Thus, the individualized issues of fact related to the breach element that defeat predominance for the breach-of-contract claim also defeat predominance for the breach-of-implied-covenant claim.

Also, in many jurisdictions, a breach-of-implied-covenant claim is inherently individual-ized.  Generally, this claim turns on whether a contracting party's "reasonable or justified expec-tations" have been denied, and what expectations are "reasonable or justified" turns on the "various factors" that "surround the parties' relationship and . . . shape or give contour to the expectations in the first instance."  23 *Williston on Contracts* § 63:22 at n.24 & accompanying text.  Courts have thus recognized that this claim involves an "individualized" and "fact intensive inquiry" that defeats predominance.  *See, e.g.*, *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-cv-81373 (DMM), 2013 WL 139913, at *2, *6, *9–10 (S.D. Fla. Jan. 10, 2013); *accord Avritt v. Reliastar Life Ins.*, 615 F.3d 1023, 1031–32 (8th Cir. 2010); *Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 345, 353 (D. Ariz. 2009).

Plaintiffs barely mention their breach-of-implied-covenant claim specifically, let alone discuss how the claim could be adjudicated using common proof across the entire Nationwide Class despite the individualized nature of the inquiry in many jurisdictions. *See* ECF No. 79-2 at 7–8, 27–28; *see generally* ECF No. 70-2. For all these reasons, the Court finds that common issues of fact do not predominate as to the Nationwide Class's breach-of-implied-covenant claim.

As for the unjust-enrichment claim, resolving it also requires an inherently individualized inquiry under many jurisdictions' laws. *See, e.g.*, *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2003) ("The success of a claim for unjust enrichment depends on the particular facts and circumstances of each case." (brackets omitted) (quoting *DJ Painting, Inc. v. Baraw Enters., Inc.*, 776 A.2d 413, 419 (Vt. 2001))); *accord CRST Expedited, Inc. v. TransAm Trucking, Inc.*, 960 F.3d 499, 509 (8th Cir. 2020); *Jarrett v. Panasonic Corp. of N. Am.*, 8 F. Supp. 3d 1074, 1089 (E.D. Ark. 2013); *Walter v. Magee-Womens Hosp. of UPMC Health Sys.*, 876 A.2d 400, 407 (Pa. Super. Ct. 2005); *Duncan v. Kasim, Inc.*, 810 So. 2d 968, 971 (Fla. Ct. App. 2002); *Trustco Bank N.Y. v. S/N Precision Enters. Inc.*, 650 N.Y.S.2d 846, 849 (N.Y. App. Div. 1996). For this reason, "common questions will rarely, if ever, predominate an unjust enrichment claim." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009); *see also In re McCormick & Co.*, 422 F. Supp. 3d at 264–66 (declining to certify seven single-state unjust-enrichment classes because of the need to consider "the factual context" of each individual case).

Plaintiffs barely mention their unjust-enrichment claim specifically, let alone discuss how the claim could be adjudicated using common proof across the entire Nationwide Class, despite the individualized nature of the inquiry in many jurisdictions. *See* ECF No. 79-2 at 7–8, 27–28 & n.9; *see generally* ECF No. 70-2. For these reasons, the Court finds that common issues of fact do not predominate as to the Nationwide Class's unjust-enrichment claim.

## 2.    Lack of Predominance in the District of Columbia Subclass

The putative District of Columbia Subclass asserts the Common Law Claims under District of Columbia law as well as claims under the District of Columbia Mortgage Lender and Broker Act ("DCMLBA") and the District of Columbia Consumer Protection Procedures Act ("DCCPPA").  In their class-certification filings, Plaintiffs do not even mention these specific claims, let alone discuss District of Columbia law or how the common issues of law or fact in this subclass will predominate over individual issues of law or fact.  Thus, at a minimum, they have not shown that common issues of fact will predominate in this subclass.

As for the breach-of-contract claim, the District of Columbia Subclass presents the same individualized issue of borrower occupancy as the Nationwide Class's breach-of-contract claim does.  Thus, common issues of fact do not predominate.

A breach-of-implied-covenant claim in the District of Columbia turns on a contracting party's "justified expectations."  *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006).  To determine a contracting party's "justified expectations," the District of Columbia Court of Appeals has repeatedly looked to the individualized context of the parties' contract.  *See, e.g.*, *Tingling-Clemmons v. District of Columbia*, 133 A.3d 241, 250 (D.C. 2016); *Adler v. Abramson*, 728 A.2d 86, 90–91 (D.C. 1999); *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1111 n.11 (D.C. 1999).  Thus, the Court finds that common issues of fact do not predominate as to the District of Columbia Subclass's breach-of-implied-covenant claim.

An unjust-enrichment claim in the District of Columbia is inherently individualized.  "[E]very unjust enrichment case is factually unique, for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next."  *4934, Inc.*

*v. D.C. Dep't of Emp. Servs.*, 605 A.2d 50, 56 (D.C. 1992).  Unsurprisingly, then, another court in this district recently declined to certify a District of Columbia unjust-enrichment class for lack of predominance given the "individualized inquiries" necessary to adjudicate such a claim.  *See In re McCormick & Co.*, 422 F. Supp. 3d at 264–66.  Thus, common issues of fact do not predominate as to the District of Columbia Subclass's unjust-enrichment claim.

As for the DCMLBA claim, the subclass asserts that Champion, through its disputed practices, violated four provisions of the law by: "directly or indirectly employ[ing] any scheme, device, or artifice to defraud or mislead borrowers"; engaging in "any unfair or deceptive practice toward any person"; failing to "make disclosures as required by . . . any . . . applicable federal or District law"; and failing to "truthfully account for monies belonging to a party to a residential mortgage loan transaction."   D.C. Code § 26-1114(d)(1), (2), (7), (14).  Presumably, they bring this claim under the DCMLBA's provision stating that nothing in the DCMLBA "shall be construed to preclude an individual or entity who suffers loss as a result of any violation" of the law "from maintaining an action to recover damages or restitution."  *Id.* § 26-1118(e).

Though it is "not clear from the face" of section 26-1118(e) that it creates a private right of action for violating section 26-1114(d), *Mushala v. U.S. Bank, Nat'l Ass'n*, No. 18-cv-1680 (JDB), 2019 WL 1429523, at *9 & n.10 (D.D.C. Mar. 29, 2019), the Court assumes that it does because the Court "may not examine whether plaintiffs have stated a cause of action . . . in order to determine whether class certification is appropriate," *In re Veneman*, 309 F.3d 789, 794 (D.C. Cir. 2002) (internal quotation marks omitted).  Even so, individual fact issues overwhelm any common issues of fact about this claim.

25

For instance, determining whether any putative subclass member "suffer[ed] loss" from Champion's conduct such that the member has a claim under the DCMLBA will require individualized analysis. *See* D.C. Code § 26-1118(e). The factfinder will have to consider each subclass member's loan file to determine whether the costs Champion assessed to the loan balance were in fact wrongful or whether, like Patton, the costs could have and would have been assessed regardless of the unreturned-occupancy-certificate default. Even if the factfinder determines that the costs were wrongly assessed, it will then have to consider the value of the borrower's home (either through a recent appraisal, if the home has not been sold, or through the sale price of the home, if the home has been sold) and compare that to what the borrower's loan balance would have been but for Champion's wrongly assessed costs. If the loan balance minus Champion's wrongly assessed costs would have exceeded the anticipated or actual sale value of the home, then the borrower's claim would fail because she did not "suffer[] loss." If a putative subclass member in this situation contends that she suffered some kind of collateral loss actionable under the law, that borrower will have to proffer additional, individualized evidence relating to that loss.

In other words, adjudicating this one set of related fact questions about the DCMLBA claim will require a parade of mini-trials. Thus, common issues of fact do not predominate as to the District of Columbia Subclass's DCMLBA claim. *See In re Rail Freight Surcharge*, 934 F.3d at 624 (affirming a lack-of-predominance finding because "individualized inquires" were necessary to determine whether about 12.7% of the individuals in the total class were "actually injured" by the defendant's conduct); *Newton*, 259 F.3d at 187 (affirming a lack-of-predominance finding because of "individual questions of whether each class member sustained economic injury").

As for the DCCPPA claim, the subclass asserts that Champion, through its disputed practices, violated four subdivisions of the law by misrepresenting a material fact that tends to mislead;

26

representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; failing to state a material fact that tends to mislead; and using innuendo or ambiguity as to a material fact that tends to mislead. *See* D.C. Code § 28-3904(e), (e-1), (f), (f-1); *see also* D.C. Code § 28-3905(k)(1)(A) (permitting a "consumer" to "bring an action seeking relief from the use of a trade practice in violation" of the law). On this claim, the subclass members request, among other things, treble damages and $1,500 per violation. ECF No. 24 ¶ 124. The DCCPPA permits recovery of treble damages or $1,500 per violation, "whichever is greater." D.C. Code § 28-3905(k)(2).

At least one individualized fact issue about this claim is readily apparent: which form of damages is "greater" for each putative subclass member, treble damages or $1,500 per violation? *See* D.C. Code § 28-3905(k)(2); *Cannon v. Wells Fargo Bank, N.A.*, 908 F. Supp. 2d 110, 113 (D.D.C. 2012). For subclass members who have not (or will not) incur lost profit because their loan balances did (or will) exceed the value of their homes regardless of Champion's wrongly assessed costs, the greater amount of damages likely will be $1,500 per violation.[10] For subclass members who will incur lost profit because of Champion's wrongly assessed costs, the "greater" damages figure will depend on several individualized questions, including how much profit the borrower lost and how many times Champion violated the DCCPPA in relation to that borrower. Resolving these fact issues as to which form of damages each subclass member is entitled to will require individualized consideration of each borrower's circumstances.

Granted, generally "individual issues with respect to the amount of damages incurred by class members" will not defeat predominance if common issues otherwise predominate. *In re*

---

[10] This calculation assumes that these borrowers have a viable DCCPPA claim in the first place. *Cf. Rose v. Wells Fargo Bank, N.A.*, 73 A.3d 1047, 1054 n.10 (D.C. 2013).

*Vitamins*, 209 F.R.D. at 268; *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984).  But, as discussed above, common issues do not otherwise predominate in this subclass.  And "significant variation in claimed damages among class members" is still "relevant to the Rule 23(b)(3) 'predominance' analysis."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 824 n.5 (9th Cir. 2012) (citing *Amchem Prods.*, 521 U.S. at 624–25); *accord Does I through III v. District of Columbia*, No. 01-02398 (HHK), 2006 WL 2864483, at *3–4 (D.D.C. Oct. 5, 2006).  The individualized damages issue as to the DCCPPA claim, if nothing else, simply confirms that several individualized fact issues in this subclass render certification inappropriate under Rule 23(b)(3).

### 3.    Lack of Predominance in the Florida Subclass

The putative Florida Subclass asserts the Common Law Claims under Florida law as well as claims under Florida's mortgage-lending law and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  In their class-certification filings, Plaintiffs do not even mention these specific claims, let alone discuss Florida law or how the common issues of law or fact in this subclass will predominate over individual issues of law or fact.  Thus, at a minimum, they have not shown that common issues of fact will predominate in this subclass.

As for the breach-of-contract claim, the Florida Subclass presents the same individualized issue of borrower occupancy as the Nationwide Class's breach-of-contract claim does.  Thus, common issues of fact do not predominate.

As in the District of Columbia, in Florida a breach-of-implied-covenant claim turns on a contracting party's "reasonable expectations."  *QBE Ins. Corp. v. Chalfonte Condominium Apartment Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012).  Thus, resolving an implied-covenant claim "requires examination of the particular circumstances of an individual case as well as the expectations of the parties," which is an individualized, "fact intensive inquiry" that is "incompatible with class

treatment." *See Kunzelmann*, 2013 WL 139913, at *6, 9–10.  Also, under Florida law, an implied-covenant claim cannot be maintained without an underlying breach of contract.  *See, e.g.*, *White v. Fort Myers Beach Fire Control Dist.*, 302 So. 3d 1064, 1072 (Fla. Ct. App. 2020) (collecting authorities).  Thus, the same individualized fact issue defeating predominance for the breach-of-contract claim defeats predominance here as well.

As for the unjust-enrichment claim, in Florida, the elements of this claim are (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying its value.  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Ct. App. 2006).  As the last element in particular suggests, in Florida, an unjust-enrichment claim inherently requires individualized consideration.  *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1100 (Fla. Ct. App. 2014) ("[C]ommon questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." (quoting *Vega*, 564 F.3d at 1274)).  Recognizing this, Florida courts have often declined to certify unjust-enrichment classes for lack of predominance under Florida's version of Rule 23(b)(3).  *See, e.g.*, *Rollins*, 951 So. 2d at 876–77; *Ortiz v. Ford Motor Co.*, 909 So. 2d 479, 480–81 (Fla. Ct. App. 2005) (per curiam); *Porsche Cars N. Am.*, 140 So. 3d at 1100; *Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090, 1093 (Fla. Ct. App. 2003).  Thus, common issues of fact do not predominate as to the Florida Subclass's unjust-enrichment claim.

As for the claim under Florida's mortgage-lending law, the subclass asserts that Champion, through its disputed practices, violated three subdivisions of the law by: knowingly or willingly employing a device, scheme, or artifice to defraud; engaging in any transaction, practice, or course of business which operates as a fraud upon any person in connection with the purchase or sale of

any mortgage loan; or obtaining property by fraud, willful misrepresentation of a future act, or false promise. Fla. Stat. § 494.0025(4)(a)–(c). The statute contains a private cause of action for "damages incurred" because of a defendant's violations of the law. *See* Fla. Stat. § 494.0019(1); *Owens-Bonniefield v. Nationstar Mortg. LLC*, 258 F. Supp. 3d 1300, 1320 (M.D. Fla. 2017).

In permitting a cause of action for "damages incurred," it seems that a plaintiff must suffer actual damages to recover under the law. *Cf. Conquest v. Auto-Owners Ins.*, 773 So. 2d 71, 74–75 (Fla. Ct. App. 1998) (holding that a Florida statute providing a cause of action when a plaintiff "is damaged" by an insurer did not permit the recovery of nominal damages under the statute's "clear and unambiguous wording"). Because Plaintiffs do not even mention this claim or discuss the statutory basis for it, the Court assumes without deciding that this is the case. And, as discussed above, determining whether a borrower incurred actual damages from Champion's disputed conduct to have a claim under this law will require extensive individualized consideration of each subclass member's case. Thus, common issues of fact do not predominate as to the Florida Subclass's mortgage-lending-law claim.

Finally, as for the FDUTPA claim, the subclass asserts that Champion, through its disputed practices, violated the law by engaging in "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The FDUTPA permits "a person who has suffered a loss as a result of a violation" of the law to recover "actual damages." *Id.* § 501.211(2). By specifying that "actual damages" may be recovered, the FDUTPA does not permit the recovery of "nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Rollins*, 951 So. 2d at 873 (collecting authorities and reversing class certification of a FDUTPA claim because some members of the putative class had "sustained an actual loss" while "many others have not"). The necessarily individualized inquiry

30

into which putative subclass members, if any, have suffered "actual damages" militates against finding that common issues of fact predominate as to this claim.  *See Chase Manhattan Mortg. Corp. v. Porcher*, 898 So. 2d 153, 158 (Fla. Ct. App. 2005) (declining to certify a FDUTPA class given the "need to examine an overwhelming number of transactions to determine which plaintiffs suffered an actual injury" (quoting *In re Agricultural Chems. Antitrust Litig.*, No. 94-40216-MMP, 1995 WL 787538, at *11 (N.D. Fla. Oct. 23, 1995))).

*         *         *

For all these reasons, each of Plaintiffs' three proposed classes does not meet Rule 23(b)(3)'s predominance requirement.  Thus, the Court will deny Plaintiffs' motion for class certification for this reason as well.[11]

## V.     Motion to Strike

Champion moves to strike the testimony and report of Plaintiffs' expert, which Plaintiffs rely on in seeking class certification.  *See* ECF No. 75; ECF No. 77-2.  Because the proposed classes fail the requirements of Rule 23 regardless of the admissibility of this expert testimony, the Court will deny as moot Champion's motion to strike.  *See, e.g.*, *Parker*, 99 F. Supp. 3d at 90.

---

[11] Plaintiffs suggest that, if the Court finds their proposed classes or class definitions deficient, it should redefine the classes itself to make them viable.  *See, e.g.*, ECF No. 79-2 at 20 n.7.  The Court may order subclassing sua sponte, but it is "under no obligation to do so."  *In re McCormick & Co.*, 422 F. Supp. 3d at 225; *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980).  Even if a viable subclass could be formed in this case—an unlikely proposition given the Court's predominance analysis—the Court declines to form one on its own motion.  *Cf. Greenlaw v. United States*, 554 U.S. 237, 244 (2008) ("[A]s a general rule, our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." (cleaned up)).

**VI.     Remand**

Because the Court finds that Plaintiffs lack Article III standing to raise any of the claims they assert on behalf of themselves and the putative classes, the Court also must conclude that it lacks subject-matter jurisdiction over their individual cases against Champion.  *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  Ordinarily, "[w]hen it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case" to the court from which it was removed.  *See Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) (citing 28 U.S.C. § 1447(c)).  This rule applies here.  *See, e.g.*, *Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 10–11 (D.D.C. 2007); *Patton v. Experian Data Corp.*, No. SACV 15-1871 JVS (PLAx), 2016 WL 262801, at *2, *6 (C.D. Cal. May 6, 2016).

Champion removed this case from the Superior Court of the District of Columbia.  Thus, the Court will remand this case to that court.

**VII.    Conclusion**

For these reasons, the Court will deny Plaintiffs' motion for class certification, deny as moot Champion's motion to strike, and remand this case to the Superior Court of the District of Columbia.  A separate order shall issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: December 30, 2021